Filed 8/19/14  In re K.R. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re K.R. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E059717 |
| Plaintiff and Respondent, | (Super.Ct.No. RIJ1201295) |
| v. | OPINION |
| S.C. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of Riverside County.  Jacqueline C. Jackson, Judge.  Affirmed.

Gareit Newstrom for Defendant and Appellant S.C.

Grace E. Clark, under appointment by the Court of Appeal, for Defendant and Appellant K.N.

Pamela J. Walls, County Counsel, Carole A. Nunes Fong, Deputy County Counsel, for Plaintiff and Respondent.

1

S.C. (Mother) and K.N. (Father) appeal from an order terminating their parental rights as to their two-year-old daughter K.N.  Mother also appeals from an order terminating her parental rights as to her 10-year-old son Ky. and seven-year-old son Ke.  Both parents contend that the juvenile court erred by finding that the "beneficial parental relationship" exception to termination did not apply.  In addition, Mother contends that there was insufficient evidence to support a finding that her sons were adoptable.  We reject these contentions and affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND[1]

The family came to the attention of the Riverside County Department of Public Social Services (DPSS) on December 20, 2012, when an immediate response referral was received alleging physical abuse and general neglect of eight-year-old Ky., six-year-old Ke., and one-year-old K.N.[2]  It was reported that Ke. had a one inch in diameter red bruise on his left hip, as well as an abrasion with purple bruising on his stomach; that Father had hit Ke. with a bat; and that Father had kept Ke. up all night on a time-out with the last incident occurring about one week prior.  It was also reported that Ke. ate only two pieces of bread and cereal all day.

---

[1] The factual and procedural background up until the denial of services is taken from this court's nonpublished opinion in case No. E058266.  (*S.C. v. Superior Court* (June 18, 2013, (No. E058266) [nonpub. opn].)

[2] Father is the father of K.N. only.  The father of Ky. and Ke. is not a party to this appeal.

When the social worker made contact with Ke., Ke. immediately began to cry and exclaimed that his mother and father would be mad at him if he spoke to the social worker. Ke. eventually disclosed the allegations and showed the social worker his injuries. The social worker observed that Ke. had a visible two-inch red bruise on his left hip area; two healing marks or scars on his chest area; a six-inch scrape mark with developing bruising that covered his left rib area to his sternum area; and several other linear scars and faint, yellow bruising on various areas of his torso. Ke. also stated that Father had tied him up to a chair for "'hours,'" and proceeded to show the social worker how Father had used a rope to wrap him around a chair. Ke. further reported that Mother had been at work, but when she got home she talked to him while he was in the chair.

Ky., who was diagnosed with high functioning autism, was unable to confirm whether his brother had recently been in trouble. Ky., however, disclosed that they oftentimes do not have enough to eat and that Father gives them two slices of bread and a sandwich bag of cereal to eat.

Due to the extent of Ke.'s injuries and Ky.'s disclosure of not having enough food to eat, the children were placed in protective custody. Ke. and Ky. were transported to a hospital for a medical examination. Ke. was found to have new and old bruises on his stomach and two burn marks. In addition, while the physician's assistant was applying pressure to Ke.'s stomach to check for broken ribs, Ke. cringed and stated it hurt. Ke. also had a bruise on the right side of his forehead which was caused by Father punching him with a closed fist. Ky. did not have any marks or bruises. A urine test revealed that

3

the boys were dehydrated and had elevated pulses, and they were given intravenous fluids and food.

While at the hospital, Ke. stated that he did not want to go home and explained how Father had placed him on time-outs. Ke. demonstrated how he had to stand on one leg while the other is bent and tied with tape to his other leg with a book over his head for one hour up to four hours. He also said that sometimes while on time-outs Father would come and kick him in the stomach.

A Child Abuse and Neglect (CAN) team examination was subsequently conducted on Ke. Ke. was found to have numerous bruises, red marks, linear bruises, and burn marks on his stomach, throat, forehead, hand, back, thighs, and buttocks. Ke. reported to the CAN team and law enforcement that the injuries were sustained when Father hit him with a belt and bat; when Father held his hand over a hot stove; and when Mother and Father pulled his ears and hit him with wooden drumsticks on his bare back and buttocks. Ke. also stated that Father had made him eat hot peppers; had rubbed hot peppers in his eyes; had whipped him with a jump rope; and had punched him, choked him, and sat on him. The examining doctor concluded that Ke. had "'multiple patterned bruising, scars consistent with severe physical abuse,'" history of inflicted trauma, and history of "'multiple extensive injuries'" consistent with torture; and that Ke. was subjected to severe physical abuse, emotional abuse, and torture.

Father reported that Ke. had behavioral issues and that he and Mother were constantly receiving calls from his school due to Ke.'s tantrums and throwing chairs. He further stated that Ke. oftentimes lied and stole candy and food. He acknowledged that

4

he had placed Ke. in time-outs by having him kneel on tile flooring for 15 minutes to two hours, and that he had disciplined Ke. based on the severity of his behavior. He denied that he had hit Ke. with a bat and explained that Ke. had oftentimes lied, had a wild imagination, and had injuries due to being very active. Father also stated that he checks the boys every night for injuries and denied seeing any injuries on Ke. Father acknowledged that he and Mother had at times tied Ke.'s legs with a rope or tape to a chair to prevent him from running away when he was supposed to be in time-out or from running around the house; that he had used wooden drumsticks to hit Ke. on the buttocks; and that Mother was aware of Father's methods of the time-outs and will even try to talk to Ke. while he is in time-out. Father also denied depriving the boys of food. Father was eventually arrested for felony child abuse.[3]

Mother was at work when the social worker spoke with Father. She refused to leave work despite Father explaining to Mother that DPSS was taking all three children. As such, the social worker spoke with Mother the following day. Mother stated that Ke. was a liar and that she believed her husband. She then admitted that she had given permission to Father to discipline the boys when she was not at home. She then refused to answer questions about the boys being tied up during time-outs without consulting her attorney. However, to an investigating detective, Mother reported that "in their culture, they beat their children and it is normal for 'things like that to occur,'" and that "'I was beaten when I was a child and look how I turned out.'" She also admitted that she and

---

[3] Mother was also eventually arrested, and criminal charges were filed against both parents.

Father had used time-outs that consisted of the children kneeling on the floor and that the time-outs lasted for days at a time if the behavior was not corrected by the child. Mother also admitted that spanking or slapping in the face was used when the children were caught lying or stealing and confirmed that Father had taped Ke. to a chair as a form of punishment. She denied knowing that Ke. had injuries or knowing anything was going on in her home, despite bathing the children every night. When shown photographs of Ke.'s injuries and asked how she had not noticed them, Mother had no explanation.

The family had prior referrals for physical abuse and general neglect with CPS. A referral was received on December 9, 2011, for general neglect and physical abuse. The referral stated that Ky. had a bruise under his left check. The parents reported that the injury was a result of the boys boxing and showed DPSS an area designated for boxing, which included boxing equipment and protective gear. The allegations were subsequently determined to be unfounded. Another referral was received on March 14, 2012, alleging general neglect. It was reported that Ky. had a one-inch bruise near his hairline. Another immediate response referral was received on March 22, 2012, alleging physical abuse of Ke. after Father had pushed the child's face into a sink full of water. At that time, following a team decision meeting, the family agreed to voluntary family maintenance services. The services were, however, discontinued in May 2012 after the parents, especially Father, were uncooperative. The parents had also stated that they did not desire any further interaction with the social worker. Finally, another immediate response referral was received on October 3, 2012, alleging general neglect and physical abuse after Ky. was observed with fingerprint bruises on his arm and his stomach was a

little distended.  The allegations were determined to be unfounded after an investigation revealed that the bruises were a result of boxing with Father and the distended stomach was due to the child overeating.

On December 24, 2012, a petition was filed on behalf of the children pursuant to section 300, subdivisions (a) (serious physical harm), (b) (failure to protect), (g) (no provision for support by the father of Ke. and Ky), (i) (cruelty), and (j) (abuse of sibling).[4]  At the detention hearing, the children were formally removed from their parents and placed in foster care.  The parents were offered services and visitation.

Ke. and Ky. were placed in the home of Ms. M., and K. was placed in the home of her paternal uncle and aunt.  The boys appeared to be healthy, happy, and well cared for. Ky. disclosed that he had also been subjected to time-outs and physical abuse by Father. Both the boys reported that they desired to stay in Ms. M.'s home and were very scared of Father.  Ky. further stated that he was not scared of Mother but admitted that she was present at times when the abuse occurred.  Ke. stated that he was scared of his mother and paternal grandparents, because they would tell Father when he would get in trouble, and Father would punish him and Mother would not stop him.  Ms. M. reported that she has had no problems with the boys; that the boys had not asked about their parents; and that the boys were fearful that Father would find them and take them.  Ky.'s instructional

_____

[4] The petition was later amended on December 28, 2012, to include allegations that Mother had inappropriately administered physical discipline to Ke. by pulling the child's ear and assisting Father in tying up the child to a chair; and that the parents had been provided with voluntary family maintenance services and failed to benefit from the services provided.

7

aide reported that since being placed in foster care, she has seen a remarkable difference in Ky. He now appeared very happy, smiled often, and had told her that he did not want to go back with his mother because he was happy. School records did not indicate that Ke. had ongoing behavioral issues and there were no concerns noted from his school.

Mother had participated in supervised visits with the children. The visits appeared to have been going well and there were no concerns until the January 31, 2013 visit. At that visit, Mother had given Ke. a card from Father, who had been directed to have no contact with the children, and the boys began acting up. The card was a computer generated card with the words "'Boxing Time!'" on the outside, and a note from Father stating that he missed them and could not wait for them to come home so they can box again. The foster mother reported that Ke., who was normally friendly with other foster children in the home, had hit another child and wet his bed. In addition, Ky. had been "'harassing'" Ke. and telling him he was going to get in trouble. The foster mother also reported that the children never play on the play area but have to sit with Mother during the entire visits; that Mother never asks the boys if they want to play; and that the boys had sad faces watching other children play. Ke. admitted that during visits they do not play on the play area and that made him sad; and that he desired to continue to see his mother but asked if they could play during the visits. Ky. also confirmed that they do not play during visits and desired to continue to see Mother but less often.

The social worker recommended that reunification services be denied to the parents pursuant to Welfare and Institutions Code section 361.5, subdivisions (b)(5) and

8

(b)(6).[5]  Based on the evidence in this case, the social worker believed that the parents would not benefit from services and that offering services to the parents would not be in the children's best interests.

The contested jurisdictional/dispositional hearing was held on February 27 and March 1, 4, 6, 7, 8, and 11, 2013.  Following the lengthy trial and hearing testimony from the boys, the social workers, and arguments from the parties, the juvenile court found all the allegations in the amended petition true, except allegation b–3 pertaining to Mother's neglect of the boys due to dehydration.  The children were thereafter declared dependents of the court, and removed from parental custody.  Reunification services were denied to Mother as to all three children and Father as to K.N. pursuant to subdivision (b)(6).  The court found that reunification services were not in the children's best interests, and set a section 366.26 permanent planning hearing.

On April 15, 2013, Mother filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452, challenging the juvenile court's order denying Mother reunification services and setting a section 366.26 hearing.[6]  The writ petition was denied by this court on June 18, 2013.

K. was placed in the home of her relative prospective adoptive parents on December 28, 2012.  She was not in need of any therapeutic services, was thriving, and

---

[5]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated, and all future undesignated subdivision references are to section 361.5 unless otherwise stated.

[6]  Father joined in Mother's arguments.

was very attached and bonded to her caretakers and their children. The prospective adoptive parents had provided K. with a very nurturing, stable, engaging, active, and comfortable home. The prospective adoptive parents had planned on allowing the parents, siblings, and paternal grandparents to visit with K., and having an open adoption where K. would remain attached to her Vietnamese culture.

K. had regular visits with her family members. She had supervised visits with her parents once a month. The visits went well and the parents were appropriate with K. She also had ongoing once a month contact with her brothers, who looked forward to the visits and were happy to see her.

The boys' prospective adoptive parents had visited the boys on a weekly basis until the boys were placed in their home on June 5, 2013. They were both developing well physically, emotionally, and educationally in the adoptive home. Ky. had no difficulties adapting to his environment, and was described by his teacher as being "'sweet, kind, respectful, and responsible.'" Ky. had an active Independent Education Plan (IEP) as he showed signs of being autistic, was reading chapter books, and answering higher level questions with the testing. Ke. was a very verbal, active, and outgoing child, and appeared academically advanced for his age. The boys were happy and comfortable in their prospective adoptive parents' home; and they desired to have a permanent home with their prospective adoptive parents where they would be loved, taken care of, and not have to fear for their safety. The boys looked to the prospective adoptive parents as their parental figures and trusted the prospective adoptive father to protect them. The boys' therapist reported that they are bonded to their prospective

adoptive parents and that they appeared comfortable in their home.  The prospective

adoptive parents had also become very attached to the boys, treated them with "'love and

affection,'" and desired to provide the boys with a permanent, safe, loving, and secure

home.

Ke. was making slow and steady progress in therapy and required only two more

months of therapy.  Ke. continued to have "'trust issues,'" could be "'hyper-vigilant,'"

and "scared at times."  Ke. also told his therapist that Mother "'never hurt [him],'" but

she also did not protect him from Father as Mother "'would not make him [Father]

stop.'"  Ke. had some behavioral issues and his therapist was working with his

prospective adoptive parents in being more consistent in disciplining him, such as setting

firm limits with Ke. and adhering to the rules.  Ke. had told his therapist that he was

comfortable in his prospective adoptive parents' home and that he would "'like to live

there forever.'"

Mother had consistently visited Ke. and Ky. once a month.  The boys liked

visiting Mother; however, at times, they were sad because Mother did not play with or

interact with the boys.  Mother appeared "a bit detached from Ky.," and Mother would

not allow the toys she brought to be taken home with Ke.  Ke. reported that he loved

Mother and that he did not want her to go to jail; he however wanted Father to go to jail.

Father and Mother had continued to report that they had not done anything wrong and

that Ke. needed a psychological evaluation.

Mother and Father completed parenting classes, an anger management program, participated in therapy, and submitted to a psychological evaluation with Dr. Robert Suiter. They also submitted letters from friends attesting to their good character.

On June 21, 2013, Mother filed section 388 petitions to modify the court order with supporting documents as to all of her three children, requesting reunification services. The juvenile court denied the petitions on June 25, 2013.

On July 1, 2013, Father filed a section 388 petition to modify the court order with supporting documents as to his daughter, requesting reunification services. The juvenile court denied the petition on July 3, 2013.

On August 17, 2013, the parents participated in a bonding study with Dr. Suiter. Dr. Suiter observed Father's interactions with K. Father appeared to be "very affectionate" with K. in the manner in which he spoke to her and held her. Father did not need toys for the time he was with K., and he was "very interactive" with her in a warm, animated, and soothing way. K. appeared to be "very comfortable" with Father both while sitting on his lap and off his lap; K. was "very responsive" to Father; and K. tended to stay close to Father and did not approach Dr. Suiter. Dr. Suiter concluded that Father "is well bonded to his daughter as she is to him as she likely looks to him as a source of safety and comfort." Dr. Suiter noted that Father had positive prognostic indicators such as intelligence, maturity, lack of substance abuse or previous aggression, and morals. Dr. Suiter further pointed out that while Father's methods of disciplining Ke. were inappropriate, Father had recognized "the maladaptive nature of his disciplining and he

12

would be more than willing to ensure he would refrain from such disciplining in the future."

Dr. Suiter also observed Mother's interactions with all three of her children. Both the boys described their mother "very favorably." They stated that Mother loved them and "always [took] good care of them," and that they missed Mother "a great deal" and "wanted to be with her." During the observation, as the children were playing on the floor, Mother moved to the floor to play with them and alternated her attention to them. Dr. Suiter noted that even though the boys had contact with Mother once per month for one hour, they were "very responsive to her" and "there was not any hint of hesitancy or anxiety" in the boys. Mother was "very calm and patient with the children," as well as warm, interactive, and soothing in her tone and style of interacting. The children gave the impression of being safe and secure with Mother. Dr. Suiter concluded that Mother "could not have interacted in a more desirable manner with the boys"; that all three children were very "bonded to their mother"; that "the boys very definitely miss their mother and want to live with her once more"; and that her daughter, based on her nonverbal behavior, "is well bonded to [Mother] and very definitely wants to be with her." Dr. Suiter also found that "there were a number of positive prognostic indicators specific to [Mother] being able to care for all three of her children in a desirable manner and [that] she would refrain from any physical disciplining of them as well as ensure they would not be physically disciplined by anyone else to include [Father]." Those factors included Mother's lack of a mental disorder or substance abuse disorder, Mother's

extreme intelligence and being highly educated, and Mother's being "trainable" in responding to parenting and anger management training.

The social worker continued to recommend that parental rights be terminated. The social worker noted that although the parents had reported that they no longer lived together, their actions of "'cuddling'" at Dr. Suiter's office suggested they continue to be in a relationship; and that returning the children to Mother's care would jeopardize the children's safety because without court intervention it appeared that Mother would return to a more intimate relationship with Father. Moreover, Ke. and Ky. continued to be scared of Father; and when they saw him during the bonding study, Ke. asked why Father was not in jail. The social worker also noted that while the bonding study was favorable, it was not completely accurate. The report failed to include Father having been made aware of his excessive discipline and inappropriate behaviors by DPSS in December 2011, March 2012, and October 2012. Further, the parents had prior general neglect and physical abuse referrals, but they had failed to stop their physical discipline of the children; and the parents had declined to participate in voluntary family maintenance services in May 2012, despite agreeing to participate in such services at a meeting. The social worker pointed out that for parents who are intelligent like Father and Mother they had failed to appropriately raise their children despite several warnings by DPSS.

The contested section 366.26 hearing was held on September 24, 2013. Mother and Father presented affirmative evidence by calling Dr. Suiter as a witness and presenting a bonding study, photographs of Mother with the children, and photographs of Father with K. Dr. Suiter reaffirmed his conclusions in the bonding studies and

14

noted that he had considerable concerns for K. if she was removed entirely from Father's care. In regard to Mother, Dr. Suiter testified that Mother had filled a parental role to the children that was more than just a friend or playmate and it was a positive bond. Dr. Suiter opined that the children would "potentially" suffer detriment if Mother's parental rights were terminated; and that the boys were bonded to Mother because they still described Mother favorably, missed her, and desired to be with her, despite having minimal contact with Mother. Dr. Suiter explained that he had used the word "potentially" because he did not have a full evaluation of the boys. Dr. Suiter explained that he would not be surprised if Ke. had indicated he wanted to live with his caretakers forever because, in his opinion, there was no likelihood that Ke. had any cognitive understanding of what forever meant. Dr. Suiter also acknowledged that children of young ages such as K., Ke. and Ky. could have a parental attachment to more than one person; and that his observations during the bonding studies lasted about 30 minutes.

Mother argued that the boys were not adoptable because Ky.'s "mental health issues in regards to being diagnosed as autistic" and behavioral issues as to Ke. Mother also argued that the parental bond exception applied, as did Father. The boys' counsel argued that no exception to the termination of parental rights applied; and K.'s counsel submitted on DPSS's recommendation that parental rights be terminated. The juvenile court found that there was no exception to termination of parental rights and that there was no showing the children would be greatly harmed if parental rights were terminated.

The court concluded the children were adoptable and terminated parental rights.  This appeal followed.

## II

## DISCUSSION

A.  *Beneficial Parent-Child Exception*

The parents contend the juvenile court erred in finding the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(A), did not apply to preclude the termination of parental rights.

After reunification services are denied or terminated, "'the focus shifts to the needs of the child for permanency and stability.'" (*In re Celine R.* (2003) 31 Cal.4th 45, 52.)  A hearing under section 366.26 is held to design and implement a permanent plan for the child.  At a section 366.26 hearing, the court must terminate parental rights and order the child placed for adoption if it determines, under the clear and convincing standard, that it is likely the child will be adopted.  (§ 366.26, subd. (c)(1).)

"'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.'" (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53; see also § 366.26, subd. (c)(1).)  "'Guardianship, while a more stable placement than foster care, is not irrevocable and thus falls short of the secure and permanent future the Legislature had in mind for the dependent child.'" (*In re Celine R.*, *supra*, at p. 53.)  A statutory exception to the general rule requiring the court to choose adoption exists where "[t]he court finds a *compelling reason* for determining that termination would be detrimental to the child" (§ 366.26, subd. (c)(1)(B), italics added)

16

because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Id*., subd. (c)(1)(B)(i); see *In re Casey D.* (1999) 70 Cal.App.4th 38, 50.) There is no dispute here that Mother and Father had maintained regular visitation with the children.

In deciding whether the parent-child beneficial relationship exception applies, "the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid*.) The parent-child relationship must "promote[ ] the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Ibid*.)

The parent-child relationship "exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348.) "[A] child should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree but does not meet the child's need for a parent." (*Id*. at p. 1350.) Even a "loving and happy relationship" with

17

a parent does not necessarily establish the statutory exception. (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419.)

"The *Autumn H.* standard reflects the legislative intent that adoption should be ordered unless exceptional circumstances exist, one of those exceptional circumstances being the existence of such a strong and beneficial parent-child relationship that terminating parental rights would be detrimental to the child and outweighs the child's need for a stable and permanent home that would come with adoption." (*In re Casey D.*, *supra,* 70 Cal.App.4th 38, 51.) "[T]he *Autumn H.* language, while setting the hurdle high, does not set an impossible standard nor mandate day-to-day contact." (*Ibid.*) "Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." (*Ibid.*) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350; see also *In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)

A parent claiming the applicability of the parent-child relationship exception has the burden of proof. (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315; *In re C.B.* (2010) 190 Cal.App.4th 102, 133-134; *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 574.) The parent must show both that a beneficial parental relationship exists *and* that severing that relationship would result in great harm to the child. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) A juvenile court's finding that the beneficial parental

18

relationship exception does not apply is reviewed in part under the substantial evidence standard and in part for abuse of discretion:  The factual finding, i.e., whether a beneficial parental relationship exists, is reviewed for substantial evidence, while the court's determination that the relationship does or does not constitute a "compelling reason" (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53) for finding that termination of parental rights would be detrimental is reviewed for abuse of discretion.  (*In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315; accord, *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622.) A juvenile court's ruling on whether there is a "compelling reason" is reviewed for abuse of discretion because the court must "determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and . . . weigh that against the benefit to the child of adoption." (*In re Bailey J.*, *supra*, 189 Cal.App.4th at p. 1315, italics omitted.)

Both parents argue that substantial evidence supports the conclusion that a beneficial parental relationship existed.  However, since it is the parent who bears the burden of producing evidence of the existence of a beneficial parental relationship, it is not enough that the evidence supported such a finding; the question on appeal is whether the evidence compels such a finding as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.)  As the court in *In re I.W.* discussed, the substantial evidence rule is "typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence." (*Ibid*.)  When, however, the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, "it is misleading to characterize the failure-of-proof issue

19

as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case [citations]. [¶] Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the [parent's] evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such character and weight as to leave no room for a judicial determination that it was insufficient to support a finding' [in the parent's favor]. [Citation.]" (*Ibid.*) Accordingly, unless the undisputed facts established the existence of a beneficial relationship as a matter of law, a substantial evidence challenge to this component of the juvenile court's determination cannot succeed. (*Bailey J.*, *supra*, 189 Cal.App.4th at p. 1314.)

Here, there is evidence that arguably would have supported a finding that a beneficial parental relationship existed between Ke., Ky., K., and Mother and between K. and Father. The evidence showed that the parents acted in a caring, attentive, and paternal manner while visiting their respective children. The evidence also showed that the children shared a bond with their respective parents. And, we agree with Mother that the existence of a beneficial parental relationship does not depend on the child having a primary attachment to the parent or on the parent being the child's primary caretaker. Rather, the exception may apply if the child has a "substantial, positive emotional attachment" to the parent. (*In re Autumn H.*, *supra*, 27 Cal.App.4th 567, 575.) However,

20

even if the juvenile court *could* have found that the children shared a beneficial

relationship with their respective parents, that does not mean that the evidence *compelled*

such a finding. It did not.

In any event, even if we assume that the evidence does compel the conclusion that

a beneficial parental relationship existed, the ultimate question we must decide is whether

the juvenile court abused its discretion by failing to find that termination of parental

rights would be so detrimental to the children as to overcome the strong legislative

preference for adoption. That decision is entrusted to the sound discretion of the juvenile

court. (*In re Bailey J.*, *supra*, 189 Cal.App.4th at pp. 1314-1315.) We cannot find an

abuse of discretion unless the juvenile court exceeded the bounds of reason. (*In re

Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) "'"'When two or more inferences can

reasonably be deduced from the facts, the reviewing court has no authority to substitute

its decision for that of the trial court."'"' (*Id*. at p. 319.)

Here, Mother and Father did not introduce any evidence showing their respective

children would be greatly harmed by the termination of their parental rights. While

Dr. Suiter performed bonding studies between the parents and their respective children,

Dr. Suiter could not definitively opine as to whether the children would be greatly

harmed by the termination of parental rights. Dr. Suiter acknowledged that he was not

asked to evaluate such an opinion and that he had not fully evaluated the boys. As the

juvenile court noted, ". . . Dr. Suiter hestitated when he discussed detriment. He

indicated he really hadn't fully assessed that, and that wasn't part of what he was asked to

fully assess." In addition, it appears that Dr. Suiter had observed the parents with their

21

respective children for about 30 minutes. Dr. Suiter also noted that children of young ages such as K., Ky., and Ke. could have a parental attachment to more than one person. There was no evidence to show that the children were crying or upset following their visits with their respective parents. Rather, the record indicates that the children, while enjoying their visits with their respective parents, were attached, happy, and well bonded to their respective caretakers and that they were thriving in their respective adoptive homes. The record also shows that the boys continued to fear Father; that Ke. believed Mother had failed to protect him; and that Mother had no plans to terminate her relationship with Father for the sake of her boys. There was no evidence whatsoever that the children would suffer great detriment if parental rights were terminated. Consequently, we cannot say it was an abuse of discretion to fail to conclude that the exception did not apply.

Both parents liken this case to *In re S.B.* (2008) 164 Cal.App.4th 289. In that case, the appellate court reversed a termination order, holding that, contrary to the juvenile court's ruling, the only reasonable inference from the evidence was that the beneficial parental relationship exception applied. In reaching that decision, the court noted that the father maintained regular, consistent and appropriate visitation with the child; he was the child's primary caretaker for three years; when she was removed from his custody he immediately acknowledged his drug use was untenable, started services, maintained his sobriety, sought medical and psychoanalytic services and complied with every aspect of his case plan; and after a year apart the child continued to display a strong attachment to her father. (*Id*. at p. 298.) The court stated: "The record shows S.B. loved her father,

22

wanted their relationship to continue and derived *some measure of benefit* from his visits. Based on this record, the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [her father]." (*Id*. at pp. 300-301, italics added.)

However, the same court which decided *In re S.B.* later warned that it was an extraordinary case and must be viewed in light of its particular facts. The court emphasized that the opinion "does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." (*In re Jason J.* (2009) 175 Cal.App.4th 922, 937; see also *In re C.F.* (2011) 193 Cal.App.4th 549, 557-559.) Rather, there must be evidence that the relationship "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents" and that severance of the relationship "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed." (*In re Autumn H.*, supra, 27 Cal.App.4th at p. 575.) Here, there simply is no such evidence.

Mother also cites *In re Brandon C.* (1999) 71 Cal.App.4th 1530. *In re Brandon C.*, however, is a social services agency's appeal from an order for guardianship rather than adoption based on the beneficial parental relationship exception. (*Id*. at p. 1533.) In that case, the court held that substantial evidence supported the juvenile court's decision to find the exception applicable based on the children's emotional attachment to their mother. (*Id*. at pp. 1534-1538.) The question before us, however, is whether the juvenile

court abused its discretion by finding the exception not applicable. *In re Brandon C.* does not provide any guidance on that issue.

In sum, the record supports the juvenile court's determination that the beneficial parent-child relationship exception did not apply in this case.

B.      *Adoptability Finding*

Mother also contends the evidence was insufficient to support the court's finding by clear and convincing evidence that Ky. and Ke. were likely to be adopted.

Whether a child is likely to be adopted is the "pivotal question" at the section 366.26 hearing. (*In re Tamneisha S.* (1997) 58 Cal.App.4th 798, 804.) Parental rights may be terminated only after a finding by clear and convincing evidence that a child will be adopted within a reasonable amount of time. (§ 366.26, subd. (c)(1); *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1204.)

To determine whether a child is likely to be adopted the court focuses on whether the child's age, physical condition, and emotional state will create difficulty in locating a family willing to adopt the child. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649.) It is not necessary that the child is already in a potential adoptive home or that proposed adoptive parents are "'waiting in the wings.'" (*Ibid*.) What is required is clear and convincing evidence that adoption is likely to be realized within a reasonable time. (*In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223.)

However, the fact that prospective adoptive parents express a willingness to adopt a child is evidence the child's age, physical and mental state, and other characteristics are not likely to dissuade others from adopting if the anticipated placement fails. (*In re*

24

*Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1649-1650.) In other words, adoptability turns on the likelihood that someone will want to adopt the child soon, not on the likelihood that a particular family hopes or intends to do so. (*Ibid*.) "[I]n some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*Id*. at p. 1650.) If the child is considered generally adoptable, we do not examine the suitability of the prospective adoptive home. (*In re Scott M.* (1993) 13 Cal.App.4th 839, 844.) When the child is deemed adoptable based solely on a particular family's willingness to adopt the child, the juvenile court must determine whether there is any legal impediment to that adoption. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061.)[7]

On review, we determine whether the record contains substantial evidence from which the court could find clear and convincing evidence that the child is likely to be adopted within a reasonable time. (*In re Gregory A.* (2005) 126 Cal.App.4th 1554, 1562; see also *In re Zeth S.* (2003) 31 Cal.4th 396, 406.) In making this determination, we resolve all conflicts in favor of the prevailing party. Issues of fact and credibility are

---

[7] The existence of a legal impediment to adoption is relevant if it "would preclude the very basis upon which the social worker formed the opinion that the minor is likely to be adopted. [Citation.]" (*In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1650.) In the present case, while it appears that the court's adoptability finding was based at least in part on the existence of prospective adoptive parents who were willing to adopt and had already committed to the adoption, we are unaware of any legal impediment to that adoption.

questions for the trier of fact, and we do not reweigh the evidence when assessing its sufficiency.  (*In re Stephanie M.*, *supra*, 7 Cal.4th 295, 318-319.)

Here, substantial evidence supports the juvenile court's finding that Ky. and Ke. were likely to be adopted within a reasonable time.  Both the boys had received regular medical care and were found to be in good health.  Ke. was described as being a very verbal, active, and outgoing child.  He enjoyed school, appeared academically advanced for his age, physically fit, and enjoyed outdoor activities.  Although Ke. had some behavioral issues and needed his prospective adoptive father in his room when falling asleep, his prospective adoptive parents noted that it was nothing they could not handle and that they still desired to adopt the boys.  Further, the prospective adoptive parents were seeing improvements daily in Ke., and Ke. appeared to feel safe, happy, and comfortable with his caregivers.  Ke. was very attached to his prospective adoptive parents who loved and nurtured him.

Ky. was described as a quiet, "sweet, kind, respectful, and responsible" young boy.  Ky. was able to cope well and had no difficulty adapting to his environment.  His prospective adoptive parents reported that Ky. loved to write, was detail oriented, had good behaviors, and was very low key.  The social worker described him as a smart child who could read and speak clearly.  Ky.'s therapist closed out his case because he did not display any problematic behavior and did not appear to have any mental or emotional issues.  Although there was some question as to whether Ky. was autistic and was behind developmentally by a couple of years, Ky. had an IEP, was able to read chapter books, was answering higher level questions with testing, and receiving speech therapy.  Ky.

appeared comfortable, safe, happy, and very attached to his prospective adoptive parents, who loved and desired to adopt Ky. Moreover, the record discloses that with stability, consistency, and nurturing the boys were improving their issues and adjusting well in their prospective adoptive home.

Mother contends that there is insubstantial evidence to support the finding that Ky. is adoptable due to his autism, developmental delays, poor social skills, and lack of evidence to show the social worker had disclosed Ky.'s autism to his prospective adoptive parents. Mother maintains that although the prospective adoptive parents had expressed a willingness to adopt Ky., it is unclear whether they wanted to adopt a child who is autistic. Mother further argues that there is insufficient evidence to support the finding Ke. is adoptable due to his behavioral and emotional issues, the difficulties the prospective adoptive parents were experiencing with Ke.'s behavioral issues, and the future problems they will face caring for the two boys.

Mother's position is flawed. A mere possibility that a child may have future problems does not mean the child is not likely to be adopted. (*In re Jennilee T.*, *supra*, 3 Cal.App.4th at p. 225.) Even where the child has problematic characteristics because of the child's age or the presence of a diagnosed medical, physical, or mental handicap, he or she is likely to be adopted and the court may not delay permanency if there is an identified prospective family willing to adopt, as here. (*In re Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1649-1650; § 366.26, subd. (c)(3).) A child with a disability, whether it be physical, mental, or emotional, is not necessarily unadoptable. (*In re Jennilee T.*, *supra*, at pp. 224-225.) Thus, even if there was evidence that Ky. was autistic or that Ke.

27

had some behavioral or emotional issues, this would not necessarily mean they were unadoptable. Indeed, if we were to adhere to Mother's way of thinking, no child with possible autism or emotional or behavioral issues could be freed for adoption until sufficient time had elapsed within which a determination could be made with absolute certainty as to the child's physical, mental, and emotional health. Furthermore, there is no evidence that the boys' prospective adoptive parents were unaware of the boys' issues. In fact, the prospective adoptive parents reported that the boys were making daily progress; they had continually expressed their willingness to adopt the boys if parental rights were terminated; and they had obtained an approved home study to adopt the boys.

The record does not support Mother's contention that there is a legal impediment to adoption by the prospective adoptive parents. (*In re Carl R.*, *supra*, 128 Cal.App.4th at p. 1061.) The prospective adoptive parents have an approved home study. The prospective adoptive parents were visiting Ky. and Ke. on a weekly basis prior to them being placed in their care on June 5, 2013. By the time of the section 366.26 hearing, they had cared for the boys for over three months and were familiar with their behaviors, their emotional and educational needs, and the support services that they required. To the extent Mother argued that one family's desire to adopt a child should not be sufficient to support a finding of adoptability because the child may become a legal orphan if the adoption fails, we disagree with such an argument. The Welfare and Institutions Code provides that if a child has not been adopted within three years of the termination of parental rights, then parental rights may be reinstated. (§ 366.26, subd. (h)(3)(C)(i)(3).) Accordingly, because statutory provisions are in place to protect children from becoming

28

legal orphans, we are not persuaded by the argument that the prospective family may decide not to adopt the boys.

Notwithstanding the above, Mother relies on numerous cases to support her argument that the evidence is insufficient to support a finding of adoptability. She relies on *In re Tamneisha S., supra,* 58 Cal.App.4th 798; *In re Jerome D., supra,* 84 Cal.App.4th 1200; *In re Amelia S.* (1991) 229 Cal.App.3d 1060; and *In re Asia L.* (2003) 107 Cal.App.4th 498. Mother's reliance on these cases is unavailing as those cases are distinguishable from the instant case.

In *In re Jerome D.*, *supra*, 84 Cal.App.4th 1200, the child's prospective adoptive parent was the mother's ex-boyfriend, who had "serious shortcomings as a caretaker" (*id*. at p. 1208), was unwilling to adopt the child, and with whom the child "seemed lonely, sad, and the stepchild or 'the odd child out'" (*id*. at p. 1206). Additionally, the child was nearly nine years old at the time of termination of parental rights, had a strong attachment to his mother, and had stated his preference to live with his mother. (*Id*. at pp. 1206-1207.) In *In re Amelia*, supra, 229 Cal.App.3d 1060, the adoption assessment report indicated that some of the foster parents for a set of 10 siblings who suffered from "various developmental, emotional and physical problems, some of a serious nature," were "*considering* adoption." (*Id*. at pp. 1062-1063.) The court stated, "This is a far cry, however, from the clear and convincing evidence required to establish the likelihood of adoption." (*Id*. at p. 1065.) In *In re Tamneisha*, *supra*, 58 Cal.App.4th 798, at the time of the section 366.26 hearing, the agency had not found an adoptive home for the child after searching for 10 months. (*In re Tamneisha*, *supra*, at p. 807.) In *In re Asia L.*,

29

*supra*, 107 Cal.App.4th 498, there was no evidence of any approved families willing to adopt the children. (*Id*. at p. 512) The children had emotional and behavioral problems serious enough to make them difficult to place for adoption (§ 366.26, subd. (c)(3)), and were not in an adoptive placement. At best, their foster parents were willing to "explore the option of adoption." (*In re Asia L.*, *supra*, at p. 512.) The court considered such evidence "too vague" to support an adoptability finding. (*Ibid*.)

In contrast, here the prospective adoptive parents were committed to adopting the boys and the boys were bonded and attached to their prospective adoptive parents. The existence of prospective adoptive parents, although not determinative, is nonetheless a factor in determining whether a child is adoptable. (*In re Erik P.* (2002) 104 Cal.App.4th 395, 400.)

Mother also relies on *In re Jennilee T.*, *supra*, 3 Cal.App.4th 212 to claim that DPSS failed to identify families willing to adopt a child who might have autism and/or significant emotional and behavioral issues. Mother's reliance on *In re Jennilee T.* is unavailing. There, the child had potential neurological problems and was at risk for developmental problems. The parents suggested that fact rendered it unlikely the child would be adopted, however, the social worker testified at the section 366.26 hearing that a "family within the system expressed an interest" in adopting her. (*Id*. at p. 224.) While that family was being considered, an out-of-state relative requested adoptive placement. (*Ibid*.) Finally, the social worker reported that "three additional families outside the system expressed an interest but had not yet been investigated, in light of the relative's request." (*Id*. at pp. 224-225.) Rejecting the parents' argument, the court was persuaded

there was "sufficient evidence adoption was likely to occur in the foreseeable future." (*Ibid*.) The court also relied on the social worker's testimony that the child was "'generally adoptable.'" (*Ibid*.) Likewise, here a prospective adoptive family had been identified and they were committed in adopting the boys. Moreover, contrary to Mother's claim, both Ky. and Ke. were generally adoptable.

Furthermore, although a child has a history of behavioral and psychological problems, when the social worker is aware of the child's medical, developmental or mental problems, but believes the problems do not impede the child's chances for adoption, the problems do not render the child unadoptable. (See *In re Jeremy S.* (2001) 89 Cal.App.4th 514, 523-525, overruled on other grounds; *In re Zeth S.*, *supra*, 31 Cal.4th at pp. 413-414.) Here, the social worker believed Ky. and Ke. were adoptable despite their behavioral and emotional problems, many of which had subsided. Moreover, the prospective adoptive parents had encountered the boys' developmental, behavioral, and/or emotional issues but were nevertheless willing to adopt them.

*In re Helen W.* (2007) 150 Cal.App.4th 71 is instructive. There, two young children "suffered from various physical and developmental conditions that required a series of evaluations and tests during their dependency." (*Id*. at p. 74.) One was developmentally disabled and had serious neurological abnormalities; the other was mildly autistic, was "significantly below average in intellectual, speech and language, and adaptive functions," and exhibited violent behavior towards other children. (*Id*. at p. 75.) According to the agency, "even though the children have significant medical and developmental challenges, they each exhibited likeable qualities, and the foster mother

31

was committed to adopting both of them." (*Id.* at p. 76.)  Nonetheless, the mother argued on appeal that the court's adoptability finding was not supported by substantial evidence. Rejecting that argument, the appellate court explained:  "Both children suffer from conditions that require time to determine the full severity of the issues they will face.  But [the agency] methodically reported the children's medical, developmental, emotional, and behavioral conditions throughout the two years of their dependency.  The adoption assessment included a synopsis of the children's conditions.  And the foster mother—the prospective adoptive parent—accompanied the children to appointments, advocated for services, and was fully aware of their medical and psychological conditions.  Nowhere in the statutes or case law is certainty of a child's future medical condition required before a court can find adoptability.  [Citation.]" (*Id.* at p. 79.)

The *Helen W.* court also rejected the mother's contention that the juvenile court "impermissibly relied upon only the foster mother's intention to adopt in finding the children adoptable." (*In re Helen W.*, *supra*, 150 Cal.App.4th at p. 79, italics omitted.) In so doing, the reviewing court pointed to evidence in the record describing the children's appealing characteristics, including their young ages, their attractive physical appearances, and their affectionate personality traits. (*Id.* at p. 80.)  Moreover, citing *In re Sarah M., supra,* 22 Cal.App.4th 1642, the court found that even if the juvenile court had relied solely on the willingness of the prospective adoptive parent to adopt, short of a legal impediment to adoption, the willingness of the adoptive parent constituted clear and convincing evidence of adoptability. (*In re Helen W., supra*, at p. 80.)

## III

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ          

P. J.

We concur:

MILLER         

J.

CODRINGTON    

J.